# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

JAH-I-DAH GUMBS,                                )
                                                )       CASE NO. ST-17-CV-272
                 Plaintiff,                     )
                                                )
         v.                                     )       ACTION FOR DAMAGES
                                                )
SCHNEIDER REGIONAL MEDICAL                      )
CENTER, MARIA C. JUELLE, P.A., JAMES W.         )       JURY TRIAL DEMANDED
FREEMAN, M.D., JOHN DOE AND JANE DOE,           )
                                                )
                 Defendants.                    )       Cite as 2020 VI Super 87
_____ )

**JULIE GERMAN EVERT, Esq.**
Law Offices of Julie German Evert
5143 Palm Passage, Suite 10A
St. Thomas, VI 00802
julieevert555@gmail.com
*Attorney for Plaintiff*

**E. MICHAEL BREZINA, III, Esq.**
V.I. Department of Justice
34-38 Kronprindsens Gade
St. Thomas, VI 00802
michael.brezina@doj.vi.gov
*Attorney for Defendants*

**LEE J. ROHN, Esq.**
Lee J. Rohn and Associates, LLC
1108 King Street, Suite 3
Christiansted, St. Croix VI 00820
lee@rohnlaw.com
*Attorney for Plaintiff*

**ROYETTE RUSSELL, Esq.**
V.I. Department of Justice
#213 Estate LaReine
Kingshill, St. Croix VI 00850
royette.russell@doj.vi.gov
*Attorney for Defendants*

**CARTY, RENÉE GUMBS,** Judge

## MEMORANDUM OPINION

¶ 1.    **PENDING BEFORE THIS COURT** is Plaintiff's "Motion for Ruling that the Virgin Islands Medical Malpractice Act Damages Cap Violates the Virgin Islands Revised Organic Act," filed on January 17, 2020. Defendants filed their "Opposition to Plaintiff's Motion for Ruling that the Virgin Islands Medical Malpractice Act Damages Cap Violates the Revised Organic Act" on February 21, 2020. Plaintiff filed her Reply on March 6, 2020. For the reasons set forth below, this

Court holds that the statutory cap on recoverable damages does not violate the Virgin Islands Revised Organic Act.

## I.    BACKGROUND

¶ 2.    On July 8, 2015, Plaintiff Jah-I-Dah Gumbs ("Plaintiff" or "Gumbs") was involved in a motor vehicle accident and sustained severe injuries. She was transported by ambulance to the Roy Lester Schneider Regional Medical Center ("SRMC") in St. Thomas, Virgin Islands. At the hospital emergency room, Marie C. Juelle, a physician's assistant, and Dr. James Freeman ("Defendants") treated Gumbs. Gumbs alleges that she complained about pain in her left leg and hip but Defendant Juelle only examined her left knee laceration and the associated swelling. Juelle ordered an x-ray of Gumbs' left knee to determine if it was fractured. The x-ray results did not show bone damage, so Juelle sutured Gumbs' knee, provided her with crutches, and discharged her on the same day. Dr. Freeman signed off on the records but never actually saw or treated Gumbs during the visit.

¶ 3.    In her motion, Gumbs explains how she remained in excruciating pain and was bedridden after being discharged. Due to the pain, she "was not able to walk, and had to use a bedpan as her pelvis was not stabilized and was severely broken and dislocated." Pl.'s Mot. 2. Five days later, on July 13, 2015, Gumbs returned to the hospital where she again complained of lower extremity pain in her left leg. This time, Defendants ordered an x-ray of her left femur and pelvis which revealed a pelvic fracture and a dislocated femoral head. Dr. Freeman personally treated Gumbs and recommended she travel to the mainland for surgery. Gumbs underwent a hip surgery at Jackson Memorial Hospital and rehabilitative care in Miami, Florida. Dr. Stephen Quinnan predicted that Gumbs will suffer from chronic pain in her left hip and leg for the rest of her life and will need additional surgeries in the years to come. Gumbs alleges that the ongoing chronic

pain and the need for future medical care resulted from the Defendants' failure to initially diagnose her fractured pelvis. She claims this delayed diagnosis led to a significantly worse outcome that could have been mitigated by proper care during her first visit to SRMC after the accident.

¶ 4.     Gumbs initiated this case on June 19, 2017, alleging three counts of negligence against Dr. Freeman, Maria C. Juelle, P.A., and SRMC for failing to properly diagnose, treat, and perform the minimally acceptable care while treating Gumbs. She seeks compensatory damages in the amount of $2 million.

## II.     DISCUSSION

¶ 5.     Gumbs challenges 27 V.I.C. § 166b as unconstitutional so that she may attempt to recover the full cost of her injuries. As it stands, even if a jury concluded Gumbs was entitled to her claimed damages, this Court would be required to reduce the award to $250,000 because of the damages limitations found in section 166b. The discussion section sets out the legal background and the standards of judicial scrutiny for Gumbs' three constitutional challenges. In the analysis section, the Court applies these standards to the merits of her claims, concluding that section 166b withstands the three constitutional challenges and should be upheld.

### A. Virgin Islands Medical Malpractice Act

¶ 6.     The Virgin Islands Health Care Provider Malpractice Act (referred to as the "MMA" or "the Act"), codified at 27 V.I.C. § 166 *et seq.*, was enacted on November 18, 1975. It sets up "a comprehensive scheme for the regulation of health care providers and the compensation of malpractice victims." *Kock v. Gov't of V.I.*, 744 F.2d 997, 1003 (3d Cir. 1984). The MMA expands the Virgin Islands Government's waiver of sovereign immunity beyond the limits prescribed by the Virgin Islands Tort Claims Act. *Id.* at 999; 33 V.I.C. § 3411. Section 166b limits the amount of damages recoverable in a medical malpractice action. It reads in full:

3

(a) The total amount recoverable for any injury of a patient may not exceed two hundred and fifty thousand dollars ($250,000) per occurrence.

(b) The only damages which may be awarded in an action under this subchapter are the following:

　　(1) economic damages; and

　　(2) noneconomic damages.

(c) The total amount awarded for noneconomic damages for any injury to a patient as a result of a single occurrence in an action under this subchapter may not exceed seventy-five thousand dollars ($75,000).

(d) No punitive damages may be awarded in an action filed under this subchapter.

(e) The maximum amounts specified in this section are inclusive of:

　　(1) actual expenses up to the time of trial paid or payable or reimbursed or reimbursable from any other source for reasonable and necessary:

　　　　(A) medical care;

　　　　(B) custodial care; and

　　　　(C) rehabilitation services;

　　(2) estimated future expenses reimbursable or payable from any other sources for reasonable and necessary:

　　　　(A) medical care;

　　　　(B) custodial care; and

　　　　(C) rehabilitation services; and

　　(3) lost earnings paid or payable from any other source.

27 V.I.C. § 166b (2020). This section caps medical malpractice plaintiffs' total recovery, of economic and non-economic damages, at $250,000, further capping non-economic damages at $75,000. It also requires the plaintiff to join the Government of the Virgin Islands as a party-defendant. 27 V.I.C. Ch. 1, Subch. IX Note (c)(2). Section 166e(a) sets up a scheme of government-subsidized malpractice insurance for healthcare professionals, directing the Commissioner of Health "to procure a group insurance policy which shall cover the cost of Professional Liability Insurance for health care providers . . . ." § 166e(a). The government pays the entire premium for public health care providers, while private practitioners reimburse the government for their premiums and practitioners working part-time for public health facilities

reimburse the government for half of their premiums. *See id.* If the Commissioner of Health does not procure a group policy, the Act authorizes him "to self-insure health care providers against claims arising out of the rendering of, or failure to render, medical care or services, or against claims for injury or death to patients . . . ." § 166e(a).

¶ 7. The legislative history of the MMA is now unavailable,[1] however earlier courts with access to the archives shed light on the legislative objectives. *See, e.g., Richardson v. Knud Hansen Mem'l Hosp.*, 744 F.2d 1007, 1012 (3d Cir. 1984) ("The Medical Malpractice Act was enacted in large part to reduce the exposure of health care providers to malpractice liability, *see* Leg. Debate on Bill 6773, 11th Leg. Sess. of V.I., Oct. 28–29, 1974 . . . ."). Notably, the Third Circuit found that the "historical purpose of the statute is to provide continuing medical care in the face of rising malpractice insurance costs and the unavailability of professional liability insurance resulting in the limitation and fear of cessation of medical practice in the islands." *Davis v. Omitowoju*, 883 F.2d 1155, 1158 (3d Cir. 1989). The Virgin Islands Supreme Court endorsed this finding in *Brady v. Cintron*, 55 V.I. 802, 816 (V.I. 2011). Moreover, the MMA's preamble calls attention to

> the need for health care, the increased cost of insurance, the discouragement of health care providers by reason of escalating insurance premiums and concludes that "the public interest . . . requires that insurance premium levels, for health care professionals . . . be retained in order to maintain high quality medical services for the Virgin Islands."

*Davis*, 883 F.2d at 1158 n.5 (quoting 1986 V.I. Sess. Laws 170).

¶ 8. The purpose of section 166b is to reduce awards in actions arising out of medical malpractice. If a jury returns an award for the plaintiff of economic and non-economic damages

---

[1] The parties and the Court have been unable to obtain any records from the legislative archives regarding the initial enactment of the MMA and the later amendments. According to legislative services, the records were destroyed due to natural occurrences. *See* Pl.'s Mot. Ex. 3 (email correspondence from Legislative Archives explaining the loss of legislative history for the MMA).

exceeding $250,000, the court is required to reduce the award to that amount. Gumbs believes this limitation on her potential damages violates equal protection, due process, and the right to trial by jury, and should therefore be invalidated by this Court.

## B. Judicial Review of Constitutional Challenges to Legislative Acts

¶ 9.     First, the Court notes that Gumbs is bringing a facial challenge to the constitutionality of the MMA based on provisions of the Virgin Islands Revised Organic Act and the United States Constitution. *See People of the V.I. v. Rosario*, 62 V.I. 429, 434 (V.I. Super. Ct. 2015) ("[A] facial challenge tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case . . . ."). Trial has not been held, and although Gumbs alleges damages greater than the MMA would allow, she has not yet been awarded anything. *See Balboni v. Ranger Am. of the V.I., Inc.*, No. ST-14-CV-366, 2018 V.I. LEXIS 4, at *6 n.29 (V.I. Super. Ct. Jan. 24, 2018) (noting that an "as-applied challenge would not be ripe for adjudication" because it would "require the factual determination of whether [the plaintiff] is awarded non-economic damages and, if so, how much . . . "), *rev'd on other grounds*, 70 V.I. 1048 (V.I. 2019). When making a facial challenge, the challenger bears the burden of proving the statute could never be constitutionally applied. *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). As explained *infra*, Gumbs has not shown that section 166b is unconstitutional on its face.

¶ 10.    This Court is mindful of its role in our tripartite system of government and the deference owed to the Legislature when making policy decisions. *Smith v. Magras*, 124 F.3d 457, 465 (3d Cir. 1997) ("[T]he doctrine of separation of powers applies with respect to the coordinate branches of government in the Virgin Islands."). The Court emphasizes that "[t]he people of the Virgin

6

Islands speak through the voice of [the] Legislature" and the judiciary does not sit to second-guess its informed judgment. *Azille v. People of the V.I.*, 59 V.I. 215, 228 (V.I. 2012); *see also Dennis v. United States*, 341 U.S. 494, 539–40 (1951) ("How best to reconcile competing interests is the business of legislatures, and the balance they strike is a judgment not to be displaced by ours, but to be respected unless outside the pale of fair judgment."). In the Virgin Islands, duly enacted legislation enjoys a "presumption of constitutionality." *Kell v. Davies*, 63 V.I. 462, 472 (V.I. Super. Ct. 2015). With these general principles in mind, the Court turns to the appropriate standard of judicial scrutiny for each claim.

¶ 11.   Gumbs raises three constitutional challenges to the MMA's $250,000 damages cap. Her first claim is that the Act violates the equal protection provision of the 1954 Virgin Islands Revised Organic Act's ("ROA") Bill of Rights. V.I.C. Rev. Org. Act of 1954, § 3 (codified 48 U.S.C. § 1561 (2018)); *see Fawkes v. Sarauw*, 66 V.I. 237, 247 (V.I. 2017) (noting that the ROA functions as a *de facto* constitution for the territory). Second, she claims the Act violates the due process provision of the ROA. Gumbs does not allege that the MMA violates the analogous provisions in the United States Constitution. Her first two arguments are primarily based on the Virgin Islands Supreme Court's recent decision in *Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048 (V.I. 2019) (summarized below), *cert. denied*, 140 S. Ct. 651. Finally, Gumbs alleges that the Act violates the right to trial by jury contained in the Seventh Amendment to the United States Constitution and made applicable to the Virgin Islands through the ROA. The legal landscape is complex, so the Court first orients the claims.

¶ 12.   When evaluating whether a legislative act violates the due process or equal protection provisions of the federal Constitution, the United States Supreme Court employs a tiered framework of scrutiny. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). If

the legislative act burdens a fundamental right or discriminates between classes of people based on race, national origin, or alienage status, the United States Supreme Courts applies strict scrutiny to evaluate the constitutionality. *Plyler v. Doe*, 457 U.S. 202, 217 (1982). This is the most demanding standard under which a law will be upheld only if it is "narrowly tailored to further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). If a legislative act discriminates on the basis of gender or against non-marital children, intermediate scrutiny applies. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). To survive intermediate scrutiny, the law must be substantially related to an important governmental interest. *Id.* If a legislative act does not burden a fundamental right or classify people based on suspect traits, it is subject to the least demanding level of judicial scrutiny, rational basis review. *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 313 (1993). Laws evaluated under rational basis review are generally upheld and need only be rationally related to a legitimate state interest to survive. *Belle Terre v. Boraas*, 416 U.S. 1, 2 (1974) (holding that lines drawn by legislatures in economic and social legislation will be respected by courts against the charge of violation of the equal protection clause if the law is reasonable, not arbitrary, and bears a rational relationship to a permissible state objective). Most state supreme courts have adopted analogous frameworks for evaluating challenges to legislative acts premised on equal protection or due process provisions of state constitutions. *See, e.g., Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1014 (Colo. 1982).

¶ 13. The Virgin Islands Supreme Court has endeavored to adopt a similar framework for interpreting the equal protection and due process provisions of the ROA. *See Balboni*, 70 V.I. at 1089–90. Acting pursuant to its Article IV power, Congress extended certain protections of the United States Constitution to citizens of the Virgin Islands as well as additional, and sometimes parallel, guarantees set out in section 3 of the ROA, known as the Virgin Islands Bill of Rights.

Recently, the Virgin Islands Supreme Court held that it has the authority to interpret the Bill of Rights provisions in the ROA as affording greater protections than the analogous provisions of the United States Constitution. *Balboni*, 70 V.I. at 1089–90 ("[W]e conclude that this Court has the power to interpret the equal protection and due process clauses found in the Bill of Rights to the Revised Organic Act in accordance with how those provisions have been interpreted by state courts of last resort interpreting their state bills of rights."). In this case, the Court is faced exclusively with the lowest tier of equal protection and due process claims.

¶ 14.    Before proceeding further, a brief overview of the *Balboni* decision is in order. In that case, the Virgin Islands Supreme Court struck down 20 V.I.C. § 555, which capped non-economic damages in actions arising out of motor vehicle accidents at $100,000. The plaintiff, Frederic Balboni, claimed damages in excess of $100,000 and argued that the cap violated his rights to equal protection, due process, and trial by jury. *Balboni*, 70 V.I. at 1052. The Court interpreted Balboni's claims as raising challenges to section 555's compliance with the ROA's Bill of Rights, rather than the United States Constitution. *Id.* at 1060. The Court then found that Congress intended the Virgin Islands judiciary to have the same authority to interpret the Bill of Rights provisions of the ROA as a state court of last resort interpreting its own state constitution. *Id.* at 1089–90. Having found this authority, the Court analyzed Balboni's claims, ultimately holding that section 555 violated the ROA's guarantee of equal protection. *Id.* at 1105. The Court did not reach Balboni's due process or trial by jury arguments. *Id.*

¶ 15.    In evaluating the equal protection challenge, the Court decided against wholesale adoption of the United States Supreme Court's tiered framework of judicial scrutiny. *Id.* at 1096. With respect to the lowest tier, rational basis review, the Court found that it had been widely criticized as a "virtual rubber-stamp of truly minimal review." *Id.* at 1094 (quoting LAURENCE H. TRIBE,

AMERICAN CONSTITUTIONAL LAW § 16–32, at 1610 (2d ed. 1988)). Instead of adopting the United States Supreme Court's form of rational basis review, the *Balboni* court looked to approaches used by state courts of last resort, finding that many employed a heightened level of review, even when evaluating legislative classifications based on economic or social status. *Id.* The *Balboni* court then adopted heightened rational basis review, or "rational basis with bite," as the appropriate standard for evaluating equal protection claims premised on the ROA. *Id.* at 1096.

¶ 16.    The Court proceeded to strike down section 555 on equal protection grounds, finding that the damages cap did not serve its alleged purpose and was based on impermissible governmental objectives. *Id.* at 1105. Section 555 contained no legislative findings to support the amount of the cap, leaving the Court to speculate as to why it was enacted. *Id.* at 1098–99. The defendants argued that the purpose of the cap was to stabilize the car insurance market, but the Court rejected this justification because there were "no legislative findings to that effect." *Id.* at 1099–1102. Moreover, the record suggested the "Legislature endorsed the cap out of an animus for personal injury attorneys and plaintiffs . . . ." *Id.* Because the cap was not reasonably related to a legitimate legislative purpose, it failed heightened rational basis review and violated the ROA's equal protection guarantee. *Id.* at 1105.

### i.    The Virgin Islands Bill of Rights: Equal Protection Provision

¶ 17.    The Fourteenth Amendment protects individuals from unfair and unequal treatment by governmental actors. U.S. Const. amend. XIV. The parallel provision in the Virgin Islands Bill of Rights, guarantees that "[n]o law shall be enacted in the Virgin Islands which shall . . . deny to any person therein equal protection of the laws." V.I.C. Rev. Org. Act of 1954, § 3. When a law is challenged on equal protection grounds, the challenging party must demonstrate that it differentiates between classes of people on an arbitrary or impermissible basis. *See, e.g., City of*

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.").

¶ 18. When the classification is based on economic or social status, rather than a protected trait, the United States Supreme Court employs its least stringent standard of scrutiny, rational basis review. To survive this level of judicial scrutiny, the action must only "bear some rational relationship to legitimate state purposes." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973). If the reviewing court can hypothesize a legitimate purpose for the classification, and the government action is rationally related to that purpose, the statute will be upheld. *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 313 (1993) ("[I]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Heightened rational basis review, on the other hand, requires "a court to analyze the actual justification for the statute, rather than engage in speculation by considering any and all possible reasons for its enactment." *Balboni*, 70 V.I. at 1094–95.

¶ 19. In evaluating Gumbs' equal protection challenge, this Court is bound by *Balboni*. Gumbs challenges section 166b as denying her, and other medical malpractice victims with severe injuries, equal protection of the law. She does not allege that section 166b involves any suspect classifications, therefore her claim is subject to the lowest tier of scrutiny. As instructed by the Virgin Islands Supreme Court, "heightened rational basis review represents the appropriate standard for determining the validity of a Virgin Islands statute under the equal protection clause of the Virgin Islands Bill of Rights." *Balboni*, 70 V.I. at 1096. Therefore, the first question this

Court will address is whether section 166b's $250,000 cap on combined economic and non-economic damages withstands heightened scrutiny, or rational basis with bite, against Gumbs' equal protection challenge.

### ii. The Virgin Islands Bill of Rights: Due Process Provision

¶ 20.    The Fifth and Fourteenth Amendments guarantee that no person shall be deprived of "life, liberty, or property, without due process of law . . . ." U.S. Const. amends. V, XIV. Again, the Virgin Islands Bill of Rights contains a parallel provision which reads: "[n]o law shall be enacted in the Virgin Islands which shall deprive any person of life, liberty, or property without due process of law . . . ." V.I.C. Rev. Org. Act of 1954, § 3. Due process consists of procedural and substantive components. Procedural due process generally guarantees an individual the right to notice, fair procedures, and a hearing before a neutral decisionmaker. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). Procedural due process "is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). When evaluating a substantive due process claim, courts ask whether the government has infringed upon a protected liberty. *Id.* at 721. If a fundamental right is at stake, courts apply strict scrutiny; if no fundamental right is at stake, courts apply rational basis review. Thus, the due process analysis proceeds much like the equal protection analysis. *Mayo v. Wis. Injured Patients & Families Comp. Fund*, 914 N.W.2d 678, 691 (Wis. 2018) ("While equal protection and due process challenges may have different implications, the analysis under both the due process and equal protection clauses is largely the same.").

¶ 21.     The Virgin Islands Supreme Court has not expressly decided whether heightened rational

basis review applies to claims that a statute violates the due process provision of the ROA. *See*

*Balboni*, 70 V.I. at 1096. However, this Court has not found support for applying heightened

rational basis review to equal protection claims and traditional rational basis review to substantive

due process claims, nor did Defendants provide any authority for such an approach.[2] In fact, forty-

six of the fifty states and the federal courts apply the same standard for due process claims not

implicating fundamental rights as they do for equal protection claims not based on suspect

classifications.[3] Recognizing that this is an issue of first impression for the Virgin Islands, this

---

[2] South Dakota appears to be the only state that applies a higher standard of scrutiny to the lowest tier of due process claims. *State v. Geise*, 656 N.W.2d 30, 40 (S.D. 2002) (applying rational basis for equal protection claim); *Lyons v. Lederle Labs., Div. of Am. Cyanamid Co.*, 440 N.W.2d 769, 771 (S.D. 1989) (same); *Knowles ex rel. Knowles v. United States (In re Certification of Questions of Law)*, 544 N.W.2d 183, 189 (S.D. 1996) (applying "real and substantial relationship" test for due process claim). The only other state applying different standards across the lowest tier of due process and equal protection claims is New Hampshire, which uses the converse approach. *Dow v. Town of Effingham*, 803 A.2d 1059, 1063 (N.H. 2002) (stating that New Hampshire applies rational basis to substantive due process claims and "fair and substantial relationship" test to equal protection claims). Delaware does not have an equal protection clause or principle in its constitution. *See Hughes v. State*, 654 A.2d 241 (Del. 1994). The Mississippi Supreme Court has occasionally signaled that an implied equal protection principle exists in the Mississippi Constitution's due process clause, but it generally evaluates equal protection claims using the federal approach. *See Miller v. State*, 740 So. 2d 858, 865 (Miss. 1999); *Mississippi Bd. of Nursing v. Belk*, 481 So. 2d 826, 830 (Miss. 1985).

[3] *See Beach Commc'ns*, 508 U.S. at 313; *Gideon v. Ala. State Ethics Com.*, 379 So. 2d 570, 573–74 (Ala. 1980) ("Since the instant case involves neither a 'suspect class' nor a 'fundamental right,' the rational basis test is the proper test to apply to either a substantive due process challenge or an equal protection challenge."); *Hilbers v. Anchorage*, 611 P.2d 31, 40 (Alaska 1980); *Valley Nat'l Bank v. Glover*, 159 P.2d 292, 299 (Ariz. 1945); *Eller Media Co. v. City of Tucson*, 7 P.3d 136, 139 (Ariz. Ct. App. 2000) ("[T]he correct standard for reviewing both constitutional claims is the rational basis test."); *Howard v. Fort Smith*, 845 S.W.2d 497, 499–500 (Ark. 1993) ("[T]he due process analysis is the same as the equal protection analysis."); *Johnson v. Dep't of Justice*, 341 P.3d 1075, 1082 (Cal. 2015) ("[F]ederal due process and equal protection principles are persuasive for purposes of the state Constitution."); *State by Colo. State Claims Bd. of Div. of Risk Mgmt. v. DeFoor*, 824 P.2d 783, 787 (Colo. 1992); *Bloomer v. Bd. of County Comm'rs of Boulder County*, 799 P.2d 942, 948 (Colo. 1990); *Ramos v. Town of Vernon*, 761 A.2d 705, 729 (Conn. 2000) ("Equal protection rational basis review is for all material purposes . . . indistinguishable from the analysis in which we would engage pursuant to a due process claim."); *Lane v. Chiles*, 698 So. 2d 260, 263 (Fla. 1997); *State v. Holland*, 841 S.E.2d 723, 728 (Ga. 2020); *Daoang v. Dep't of Educ.*, 630 P.2d 629, 633 (Haw. 1981); *Bint v. Creative Forest Prods.*, 697 P.2d 818, 823 (Idaho 1985) ("The applicable standard of analysis under a due process challenge is the same as under an equal protection challenge: whether the challenged law bears a rational relationship to a legitimate legislative purpose."); *People v. Hollins*, 971 N.E.2d 504, 516 (Ill. 2012); *Pulliam v. State*, 345 N.E.2d 229, 241 (Ind. 1976); *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 540–41 (Iowa 2019); *Peterson v. Garvey Elevators, Inc.*, 850 P.2d 893, 897 (Kan. 1993) ("The test in determining the constitutionality of a statute under due process or equal protection weighs almost identical factors."); *Commonwealth Nat. Res. & Envtl. Prot. Cabinet v. Kentec Coal Co.*, 177 S.W.3d 718, 724–26 (Ky. 2005); *Progressive Sec. Ins. Co. v. Foster*, 711 So. 2d 675, 685–88 (La 1998); *Aseptic Packaging Council v. State*, 637 A.2d 457, 459–461 (Me. 1994) (applying slightly different articulations of a rational basis

Court is guided by *Balboni*, which emphatically rejected traditional rational basis review when considering an equal protection challenge. *Id.* at 1094 ("[S]tate courts of last resort . . . have overwhelmingly rejected . . . rational basis review."). The reasoning in *Balboni*, combined with the approaches taken by the federal courts and forty-six states, convinces this Court that analogous standards should apply across the lowest tier of equal protection and due process claims. Moreover, a statute that survives heightened review necessarily survives the more forgiving traditional rational basis review. Thus, in finding that section 166b survives heightened rational basis review, this Court need not definitively resolve which standard should apply to due process claims. *Murrell v. People of the V.I.*, 54 V.I. 338, 347 (V.I. 2010) ("[C]ourts possess an obligation to avoid deciding constitutional issues needlessly.") (quotations omitted).

¶ 22.   Gumbs challenges the damages cap on the grounds that it deprives her of due process of law by impeding her full and fair access to the courts and the jury. Gumbs does not assert that any of her fundamental rights arising under substantive due process have been abridged, so this Court will employ the heightened rational basis review standard enunciated in *Balboni* in considering

---

standard to due process and equal protection claims); *Tyler v. City of Coll. Park*, 3 A.3d 421, 435 (Md. 2010) ("[T]he test for determining whether a statute violates the equal protection component of Article 24 is nearly identical to the due process examination."); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 960 (Mass. 2003); *Phillips v. Mirac, Inc.*, 685 N.W.2d 174, 178 (Mich. 2004) ("[T]he tests for due process and equal protection are essentially the same . . ."); *Fletcher Props. v. City of Minneapolis*, No. A18-1271, 2020 Minn. LEXIS 360, at *3 (July 29, 2020); *O'Neil v. Baine*, 568 S.W.2d 761, 767 (Mo. 1978); *Mont. Cannabis Indus. Ass'n v. State*, 368 P.3d 1131, 1148 (Mont. 2016); *Citizens of Decatur for Equal Educ. v. Lyons-Decatur Sch. Dist.*, 739 N.W.2d 742, 763 (Neb. 2007); *Martinez v. Maruszczak*, 168 P.3d 720, 731 (Nev. 2007); *Drew Assocs. of N.J., Ltd. P'ship v. Travisano*, 584 A.2d 807, 812 (N.J. 1991); *Cummings v. X-Ray Assocs. of N.M., P.C.*, 918 P.2d 1321, 1332 (N.M. 1996); *Hernandez v. Robles*, 855 N.E.2d 1, 20 (N.Y. 2006); *Rhyne v. K-Mart Corp.*, 594 S.E.2d 1, 15 (N.C. 2004); *Hoots v. K.B. (In the Interest of A.B.)*, 663 N.W.2d 625, 636 (N.D. 2003); *Simpkins v. Grace Brethren Church of Del.*, 75 N.E.3d 122, 135 (Ohio 2016); *Ross v. Peters*, 846 P.2d 1107, 1118 (Okla. 1993); *Urton v. Hudson*, 790 P.2d 12, 16 (Or. Ct. App. 1990); *Vail v. Bandon*, 630 P.2d 1339, 1342 (Or. Ct. App. 1981); *Driscoll v. Corbett*, 69 A.3d 197, 215 (Pa. 2013); *Fed. Hill Capital, LLC v. City of Providence*, 227 A.3d 980, 991 (R.I. 2020); *Denene, Inc. v. City of Charleston*, 596 S.E.2d 917, 920–923 (S.C. 2004); *Riggs v. Burson*, 941 S.W.2d 44, 48 (Tenn. 1997); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998); *State v. Candedo*, 232 P.3d 1008, 1014 (Utah 2010); *State v. Drej*, 233 P.3d 476, 486–87 (Utah 2010); *Parker v. Gorczyk*, 744 A.2d 410, 419 (Vt. 1999); *State v. Stewart*, 438 A.2d 671, 677 (Vt. 1981); *Willis v. Mullett*, 561 S.E.2d 705, 709 (Va. 2002); *Chong Yim v. City of Seattle*, 451 P.3d 694, 698 (Wash. 2019); *State v. Alfonso*, 702 P.2d 1218, 1221 (Wash. Ct. App. 1985); *Gibson v. W. Va. Dep't of Highways*, 406 S.E.2d 440, 444 n.8 (W. Va. 1991); *Mayo*, 914 N.W.2d at 691; *White v. State*, 784 P.2d 1313, 1315 (Wyo. 1989).

this claim. Accordingly, the second question before this Court is whether the $250,000 cap on combined economic and non-economic damages complies with procedural due process and withstands heightened scrutiny against a substantive due process challenge.

### iii. The United States Constitution: Right to Trial by Jury

¶ 23. The Seventh Amendment provides that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Seventh Amendment applies to the Virgin Islands through section 3 of the ROA, which states:

> [T]he following provisions of and amendments to the Constitution of the United States are hereby extended to the Virgin Islands to the extent that they have not been previously extended to the territory and shall have the same force and effect there as in the United States or in any State of the United States: . . . the first to ninth amendments inclusive . . . .

V.I.C. Rev. Org. Act of 1954, § 3; *see also Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 433 n.21 (V.I. 2016) (explaining that the Seventh Amendment was extended to the Virgin Islands by the 1968 amendments to the ROA). In *Antilles School*, the Virgin Islands Supreme Court declined to address whether the Seventh Amendment's reference to "common law" should be interpreted according to common law principles in 1791, the original date of enactment, or 1968, the date of application to the Virgin Islands. 64 V.I. at 433 n.21; *cf. Caron v. First Pa. Bank, N.A.*, 16 V.I. 169, 173 (V.I. Terr. Ct. 1979) (assessing a Seventh Amendment argument by looking to common law practices in 1791). The Court did note, however, that it was "likely bound by the United States Supreme Court's" Seventh Amendment jurisprudence. *Id.*

¶ 24. This Court agrees and believes it is bound by United States Supreme Court precedent interpreting the Seventh Amendment. The United States Supreme Court uses a historical test to

determine whether the Seventh Amendment's guarantee has been abrogated. *Markman v. Westview Instruments*, 517 U.S. 370, 376 (1996). Under this approach, courts ask: (1.) whether the cause of action was tried at law at the time of the founding or is at least analogous to one that was; and (2.) if the action in question belongs in the law category, whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791. *Id.* Gumbs insists that the medical malpractice damages cap infringes upon the jury's fact-finding role when determining damages, which is protected by the Seventh Amendment. Gumbs' claim is clearly one that was historically tried at law and not in equity, *Ross v. Bernhard*, 396 U.S. 531, 533 (1970), so this Court need only inquire as to whether section 166b's $250,000 cap on combined economic and non-economic damages preserves "the substance of the common law right" to trial by jury.

## III.    ANALYSIS

¶ 25.    Having settled on the appropriate standards of judicial scrutiny, the Court now turns to the merits of Gumbs' challenges. The Court also evaluates precedent from state courts faced with similar challenges, finding that the weight of authority supports upholding section 166b. In short, this Court is convinced that the Virgin Islands Legislature acted on an informed and legitimate basis when enacting section 166b. The Virgin Islands has unique difficultly obtaining quality medical care and the Legislature's decision to limit medical malpractice awards in order to reduce government spending and increase the availability of services for residents is one that must be respected. Absent a showing that the Legislature acted improperly or arbitrarily in enacting section 166b, the Court will not interfere with its reasoned judgment. While in certain cases the cap will leave victims undercompensated, the Legislature has determined limiting malpractice awards is in the best interest of the general public and the government treasury.

### A. Gumbs' Equal Protection Claim Fails.

¶ 26.   The Court first finds that section 166b's $250,000 damages cap implicates the equal protection clause of the Virgin Islands Bill of Rights. On its face, section 166b distinguishes between medical malpractice victims and other classes of personal injury victims. *Balboni*, 70 V.I. at 1093. It also categorizes medical malpractice victims and precludes those with total damages greater than $250,000 from obtaining full compensation for their injuries. *Id.* Last, it treats victims with greater than $75,000 of non-economic damages differently than other victims, again by precluding them from obtaining full relief. Thus, section 166b contains facial classifications treating certain categories of plaintiffs differently than others.

¶ 27.   Having decided that the equal protection clause is implicated by section 166b, the Court turns to the standard of judicial scrutiny. Under *Balboni*, heightened rational basis review is the appropriate standard, at least where no suspect classification is involved, as is the case here. *Id.* at 1096. When applying this standard, a court must "analyze the actual justification for the statute" and "conduct an inquiry to determine whether the legislation has more than a speculative tendency as the means for furthering a legislative purpose." *Id.* at 1095; *see also Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156, 166 (Ala. 1991); *Johnson v. St. Vincent Hosp., Inc.*, 404 N.E.2d 585, 597 (Ind. 1980); *Carson v. Maurer*, 424 A.2d 825, 830 (N.H. 1980); *Mayo*, 914 N.W.2d at 692. To survive, the statute must rest on clear legislative findings and at least a "modicum of evidence" that the means employed further the ends. *Balboni*, 70 V.I. at 1097.

¶ 28.   The *Balboni* court identified the three analytical approaches to heightened rational basis review: 1.) the ends approach, where a statute is invalid if it seeks an impermissible governmental purpose; 2.) the means approach, where a statute is invalid if it lacks a sufficient connection between the classification and the purpose; and 3.) the combination approach, where a statute is

17

invalid because of some impermissible governmental purpose and an insufficient relation between the classification and other legislative purposes. *Id.* at 1095–96. If a statute fails any of the three, it is unconstitutional. *Id.* Both the ends and combination approaches ask the Court to consider the "actual legislative purpose as well as any inference or warning signs of an improper purpose, such as suspicion of improper influence, backroom dealings, discrimination, or a desire to harm a politically unpopular group." *Id.* 1101–02. Without legislative history, the Court cannot ascertain any signs of improper purpose or motive, and therefore focuses on the means approach.

¶ 29.    Gumbs argues that the MMA lacks a clear purpose, which is only articulated in *Davis v. Omitowoju*, 883 F.2d 1155 (3d Cir. 1989), and therefore it cannot withstand heightened scrutiny. Pl.'s Mot. 12. In *Davis,* the Third Circuit stated that the MMA "calls attention to the need for health care, the increased cost of insurance, the discouragement of health care providers by reason of escalating insurance premiums and concludes that the 'public interest . . . requires that insurance premium levels, for health care professionals must be retained in order to maintain high quality medical services for the Virgin Islands.'" *Davis*, 883 F.2d at 1159 n.5 (quoting 1986 V.I. Sess. Law 170). Gumbs alleges that this basis for enacting the damages cap is insufficient to survive heightened scrutiny because it is based on "pure speculation and [lacks a] modicum of evidence indicating that the arbitrary cap serves the purpose of lowering premiums." Pl.'s Mot. 13. She contends that the MMA stands in contrast to statutes that were upheld because the legislative findings contained "actuarial studies, documentary evidence, and testimony demonstrating a connection between a cap and that purpose." *See* Pl.'s Mot. 13; *see also Balboni*, 70 V.I. at 1097 (citing *Mayo*, 914 N.W.2d at 693–95; *Evans ex. rel. Kutch v. State*, 56 P.3d 1046, 1053–54 (Alaska 2002)). She also points out, correctly, that the holding in *Davis* is not controlling because the Third

Circuit utilized the more deferential rational basis review rejected in *Balboni*. Pl.'s Mot. 13 n.4;

*see also Balboni*, 70 V.I. at 1096 n.45.

¶ 30.    Gumbs found that many non-economic damages caps have been held unconstitutional by

states' highest courts. *See generally* Pl.'s Mot. 7; *see also N. Broward Hosp. Dist. v. Kalitan*, 219

So. 3d 49, 59 (Fla. 2017) (finding damages cap unconstitutional on state equal protection grounds);

*Atlanta Ocuplastic Surgery, P.C. v. Nestlehutt*, 691 S.E.2d 218, 223 (Ga. 2010) (concluding that

"the caps infringe on a party's constitutional right, as embodied in [the Georgia Constitution], to a

jury determination as to noneconomic damages"); *Lebron v. Gottlieb Mem'l Hosp.*, 930 N.E.2d

895, 914 (Ill. 2010) (finding statute limiting noneconomic damages in medical malpractice cases

unconstitutional under state separation of powers clause). Non-economic damages compensate

successful plaintiffs for past and future pain and suffering, loss of enjoyment of life, and other

intangible losses.

¶ 31.    Additionally, Gumbs demonstrated that most states do not cap economic damages, which

compensate successful plaintiffs for past and future medical costs and other actual monetary losses.

The few states that cap economic damages generally have caps over a million dollars, some

incrementally increasing with inflation. Pl.'s Mot. 6 (citing Va. Code Ann. § 8.01-581.15 (2020)

(sliding scale from $1,500,000 to $2,950,000 through 2031); Ind. Code Ann. § 34-18-14-3 (2020)

(sliding scale cap of $1,250,000 in 2017 to $1,800,000 after 2019); Colo. Rev. Stat. 13-64-302

(2020) ($1,000,000 flat cap)). As the Virgin Islands cap is an outlier, joining only five states in

capping total damages and at a far lower amount, Gumbs argues section 166b denies the worst

injured medical malpractice victims equal protection under the law.

¶ 32.    Gumbs also argued that the $250,000 cap should be struck down because the Legislature

failed to establish how limiting a victim's past and future economic damages bears any rational

connection to insurance premiums for healthcare professionals in the Virgin Islands. *Id.* at 14. She

claims that irrespective of the cap, the territory is experiencing a healthcare crisis and there is no

evidence of lower insurance premiums. *Id.* at 14. Consequently, the lack of an evidentiary

connection between the cap on economic damages and the malpractice premiums means that

section 166b is not rationally related to a legitimate purpose.

¶ 33.    Here, however, Gumbs fails to recognize several pertinent factors. Gumbs overlooks the

fact that medical malpractice insurance in the Virgin Islands is procured and largely paid for by

the government. Gumbs relies heavily on *Balboni* but fails to address the significant differences

between car insurance and medical malpractice insurance. With a single malpractice insurance

policy covering nearly all providers, limiting the possible payout will clearly lower the premiums.

The *Balboni* court found that section 555 did not serve its purpose of lowering car insurance

premiums because "private market actors" could simply refuse to "write an automobile insurance

policy to cover non-economic damages greater than $100,000." *Balboni*, 70 V.I. at 1103. The

Court found that this would have the same effect as the cap and therefore no connection could be

drawn between the statute and lower premiums. Car insurance, also in the Virgin Islands, is

provided by large companies who can spread their risk nationally and the government regulates

the market, but it does not participate or back the coverage. *See* 20 V.I.C. §§ 701–713 (2020). In

contrast, medical malpractice insurance is provided and largely paid for by the Virgin Islands

government. The MMA mandates providers have coverage up to the exact amount of the cap. By

ensuring that liability is coextensive with coverage, the MMA ensures victims will be

compensated; and by limiting liability to $250,000, the MMA stabilizes premiums in a relatively

small and volatile insurance market.

¶ 34. Defendants, on the other hand, argue that *Balboni* is distinguishable for the following reasons. First, unlike *Balboni* where section 555 treated certain classes of people differently based on their injury, section 166b only treats people differently based on the amount of recovery sought and does not discriminate based on the type of injury suffered. Defs.' Opp'n 9–10. This argument is without merit because section 166b treats people who have injuries from medical malpractice differently than those with other types of injuries by limiting recovery. Second, Defendants argue that faced with the loss of legislative history, the Court should presume a proper justification for the statute, rather than infer that it was enacted on an improper basis. *Id.* at 11. The Legislature could have conducted an extensive and comprehensive analysis supported by concrete facts and statistics, actuarial studies, or expert testimony to support the cap, and without access to legislative history, the Court cannot infer to the contrary. *Id.* at 10–11. The Court agrees with Defendants on this point. In the absence of legislative records, this Court cannot opine that the MMA was insufficiently supported when enacted, nor hypothesize an improper motive. *See generally id.* at 10–11, 15. The Court will not invalidate duly enacted legislation simply because the legislative history is unavailable.

¶ 35. In addition, Defendants argue that the available evidence surrounding the enactment of 166b demonstrates a clear and proper legislative purpose. Specifically, Defendants point out that "physicians were threatening to go on strike due to medical malpractice premiums" and "cease all but emergency attention at the Knud-Hansen and Charles Harwood Memorial Hospitals by October 15 unless the medical malpractice insurance problem was resolved." *Id.* at 11; *see also* Defs.' Ex. (*Governor, Doctors To Meet on Malpractice*, The Daily News, Oct. 9, 1975).

¶ 36. In terms of the parties' contentions, the Court agrees with Gumbs that the Virgin Islands' $250,000 cap is an outlier when compared to states with privately backed medical malpractice

insurance schemes. The Court does not agree that the lack of legislative history supports an inference of impermissible purpose. With no indication of impermissible motives and all available evidence supporting a legitimate purpose, the Court will presume the Legislature acted with proper motives. Moreover, as further explained below, the Court finds the legislative purpose readily apparent from the face of the statute.

¶ 37. While *Balboni* clearly controls the analytical framework for evaluating constitutional challenges to damages caps, it does not dictate the outcome in every case. *Balboni*, 70 V.I. at 1097 ("[C]ourts have consistently *upheld* damage[s] caps against equal protection challenges when the government has pointed to clear legislative findings as to the purpose of the legislation—combined with at least a modicum of evidence indicating that the cap serves that purpose . . . .") (emphasis added). Under *Balboni*, a damages cap will survive heightened rational basis review using the means approach "if there is some actual connection (other than mere speculation) between the cap actually selected and the goal of stabilizing the market." *See Balboni*, 70 V.I. at 1102. Here, the Court finds a clear legislative purpose and a modicum of evidence that the cap serves that purpose.

¶ 38. First, section 166b is a central feature in the larger statutory scheme governing medical malpractice in the territory. Found in Title 27, Subchapter IX, of the Virgin Islands Code, the MMA consists of a comprehensive strategy to govern medical malpractice claims, liability, and insurance. Among other things, the MMA: controls the healthcare provider group insurance policy; sets up a health care consumer complaint review committee; permits counter claims by the insured party; limits attorney contingency fee percentages; sets up a fund for payment of claims; and sets the parameters for insurer liability and coverage. 27 V.I.C. §§ 166–166m. Most relevant here, section 166e provides that "[t]he Commissioner of Health is hereby authorized and directed to procure a group insurance policy which shall cover the cost of Professional Liability Insurance for

22

health care providers." § 166e(a). Not only does the government procure the policy, it pays most

of the premiums:

> (1) For said health care providers exclusively employed by the Government of the Virgin Islands on a full-time basis, *the entire premium shall be borne by the Government of the Virgin Islands.*
> (2) For said health care providers who, in addition to their employment with the Government of the Virgin Islands, engage on their own time in a private practice, *one-half of the premium shall be paid for by said provider and one-half by the Government of the Virgin Islands.*

*Id.* (emphasis added); *see also Berry v. Curreri*, 837 F.2d 623, 627 (3d Cir. 1988) ("[T]he cost of

malpractice insurance . . . is borne in significant amount by the Government of the Virgin

Islands."). Full-time private practitioners are covered by the policy but must reimburse the

government for their premiums. *Id.* ("Health care providers who engage in private practice and

who participate in the group insurance policy procured by the Commissioner of Health shall

reimburse the Government for their premiums . . . ."). This section mandates that all providers

practicing in the territory obtain coverage of $250,000 per occurrence. *Id.* It further establishes a

"Medical Malpractice Risk Management Trust Fund to provide coverage against professional

medical malpractice liability." § 166e(g)(1).

¶ 39.    When examining the MMA, the legislative purpose behind the damages cap becomes

clear—it reduces the cost of the insurance premiums paid by the government. Further, it helps to

stabilize what would otherwise be a geographically isolated and volatile coverage area. *See Berry*,

837 F.2d at 627 ("[T]he $250,000 limit is an essential feature of the legislative scheme for

stabilizing the cost of malpractice insurance . . . ."). The cap seeks to ensure the fund is not depleted

by a few large claims, thereby providing compensation to a greater number of victims. Reducing

government costs while attempting to foster greater availability of healthcare services to the

territory is, of course, a permissible legislative objective.

¶ 40. In addition to reducing government costs and drawing healthcare providers to the Virgin Islands, the MMA seeks to ensure greater healthcare access for residents. Provisions guarantee that residents on "Medicare and Medicaid and veterans of the United States Military Services" will receive medical services, even through private practitioners. *See* 27 V.I.C. § 166e(f). The Virgin Islands has only two hospitals and two federally qualified health centers.[4] The territory struggles to recruit and retain providers, many of whom are deterred by low payment rates resulting in part from a large percentage of uninsured patients and high operating costs.[5] In fact, the Virgin Islands has the least amount of healthcare professionals per capita of any state or territory.[6] Most states have approximately 5,000 healthcare professionals per 100,000 people, while the Virgin Islands has only 1,210 healthcare professionals serving at least 106,977 people.[7] The situation is further complicated by the uncertainty and limits on federal Medicaid funding.[8] By mitigating the cost of medical malpractice insurance premiums for healthcare providers, the statute attempts to ensure healthcare access for a greater number of residents in a *quid pro quo* arrangement.

¶ 41. Having found a clear and permissible legislative purpose, the only question remaining is whether there is a "modicum of evidence" that section 166b serves its purpose. While it is not known exactly how the $250,000 limit was arrived at, the Court is satisfied that the Legislature deliberated and considered the amount of the cap. In fact, the provision containing the monetary

---

[4] Samantha Artiga et al., *Health Care in Puerto Rico and the U.S. Virgin Islands: A Six-Month Check-Up After the Storms*, KAISER FAMILY FOUNDATION (April 24, 2018), https://www.kff.org/medicaid/issue-brief/health-care-in-puerto-rico-and-the-u-s-virgin-islands-a-six-month-check-upafter-the-storms-report/.
[5] *Id.*
[6] *Total Healthcare Employment*, KAISER FAMILY FOUNDATION (May 2018), https://www.kff.org/other/state-indicator/total-health-care-employment/?activeTab=map&currentTimeframe=0&selectedDistributions=total-health-care-employment&sortModel=%7B%22colId%22:%22Total%20Health%20Care%20Employment%22,%22sort%22:%22desc%22%7D (compiling data from *State Occupational Employment Statistics Survey*, BUREAU OF LABOR STATISTICS (May 2018), http://www.bls.gov/oes/tables.htm.).
[7] *Id.*
[8] D. Andrew Austin, *Economic and Fiscal Conditions in the U.S. Virgin Islands*, CONGRESSIONAL RESEARCH SERVICES (Feb. 13, 2020), https://fas.org/sgp/crs/row/R45235.pdf.

cap was amended in 1993 to make clear that it applied "per occurrence." 1993 V.I. Sess. Laws 5864.[9] Had the Legislature felt the cap was too low, or that it should be adjusted to reflect inflation, it could have easily increased the amount, or established a sliding scale over a set period, at that time. The Legislature's refusal to increase the cap when revisiting section 166b, demonstrates the intent, or at least acquiescence, that the cap remain flat at $250,000 in 1993, and into perpetuity or until new legislation is introduced. Defendants stated that the cost of malpractice premiums in the Virgin Islands has not increased since 1993. Assuming this is correct, nearly thirty years of stable premiums is at least a modicum of evidence that the cap works. Some practitioners may still be leaving the Virgin Islands, but the Court has not found support for Gumbs' contention that there is an ongoing "healthcare crisis." Concerns about exactly how effective the cap is or whether it should be increased are better directed to the Legislature.

¶ 42. The MMA is also distinguishable from section 555 and most other states' medical malpractice damages caps because the legislative purpose is not solely to stabilize the insurance market. Another central purpose of section 166b's cap is to reduce government spending. Without the cap, the government would be required to pay multi-million-dollar awards to medical malpractice victims that could quickly deplete funds. In *Brady v. Cintron*, the Virgin Islands

---

[9] The relevant amendments read:

> Title 27, Chapter 1, Subchapter IX, Section 166, Virgin Islands Code, is amended by redesignating subsections (g) through (l) as subsections (i) through (n), respectively, and adding new subsections (g) and (h) to read as follows:
>
> > "(g) 'occurrence' means all losses sustained as a result of the same act or omission constituting negligence, which constitutes a single occurrence, happening, or event for purposes of applying the $ 250,000 coverage limitation as contained in Section 166b of this Chapter. . . ."
>
> (a) Subsection (a) is amended to read as follows:
>
> > "(a) The total amount recoverable for any injury of a patient may not exceed two hundred and fifty thousand dollars ($ 250,000) per occurrence."

Supreme Court found that the MMA was enacted because "the public interest . . . requires that insurance premium levels, for health care professionals must be retained in order to maintain high quality medical services for the Virgin Islands." 55 V.I. at 816 (citing 1986 V.I. Sess. Laws 170). If the government's malpractice insurance scheme fails for lack of funds, the Virgin Islands would be forced to turn to the private market. From what the Court can glean, this is exactly what the MMA was enacted to avoid.

¶ 43.    Based on all available information this Court holds that section 166b does not violate the equal protection clause of the ROA. The statutory scheme, subsequent amendments, and earlier courts' articulations of the legislative intent have satisfied this Court that section 166b was enacted for an important and legitimate governmental purpose. Moreover, the $250,000 cap appears to be an acceptable means of serving that purpose, supported by evidence that it is working.

### B. Gumbs' Due Process Claim Fails.

¶ 44.    Second, Gumbs alleges that 166b's damages cap "unconstitutionally infringes upon the due process rights of Virgin Islanders" because it deprives citizens of access to the courts and a full and fair jury trial. *See* Pl.'s Mot. 15. On the basis that her recovery will be limited to $250,000, Gumbs claims she is deprived of possible economic damages that are her property. *Id.* at 16. She argues that section 166b constitutes "a taking and redistribution of [Gumbs'] money in favor of a physician. . . ." *Id.* Meanwhile, Defendants argue that because the Virgin Islands Supreme Court never "enunciate[d] any new heightened rational basis standard regarding due process," this Court must apply traditional rational basis review. Defs.' Opp'n 15–16. They urge that 166b should survive because the government has a legitimate interest in "maintaining low malpractice premiums" and there is evidence that the cap is operating as intended. *Id.* It is not entirely clear

whether Gumbs is alleging a procedural due process violation or a substantive due process violation, so this Court will evaluate both. *See* Pl.'s Mot. 15.

¶ 45. The primary components of procedural due process are notice and the right to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Procedural due process is required where a deprivation of a constitutionally protected interest has occurred. *See People of the Virgin Islands v. Rohn*, 55 V.I. 100, 118 (V.I. Super. Ct. 2011) (finding that a driver's license is a property interest that cannot be deprived without due process of law); *In re Najawicz*, 50 V.I. 104, 110–12 (V.I. Super. Ct. 2008) (upholding statutory seizure of financial assets as complying with procedural due process requirements); *Goodwin v. St. Clair Goodwin*, 23 V.I. 80, 90 (V.I. Terr. Ct. 1987) (holding that a ten day TRO keeping someone out of his home invoked procedural due process protections). When considering a procedural due process claim, courts balance three factors: (1.) the private interest; (2.) the risk of erroneous deprivation from the procedures in place and any probable value of alternative procedural safeguards; and (3.) the government's interest. *Rohn*, 55 V.I. at 118; *see also Mathews*, 424 U.S. at 335. This first requires "identification of the nature and weight of the private interest affected by the official action challenged." *Rohn*, 55 V.I. at 118.

¶ 46. Gumbs' procedural due process argument fails at the initial step. She alleges the cap on damages constitutes a taking of her property but fails to establish a constitutionally protected property interest in the hypothetical $2 million dollar award. She cites no caselaw in support of finding a constitutionally protected property interest in a potential jury verdict. *See* Pl.'s Mot. 16. A mere expectation of a $2 million damages award is insufficient to warrant procedural due process protection. *See Garcia v. Gov't of the V.I.*, 24 V.I. 131, 135 (V.I. Terr. Ct. 1989) (holding that procedural due process protections are not required where someone has "a mere expectation in a property interest"). Cases within this jurisdiction clearly establish the defendant must be at risk

of governmental deprivation of an already existing private interest. *Estate of Ludington v. Jaber*, 54 V.I. 678, 684 (V.I. 2011); *Kell*, 63 V.I. at 471; *Pate v. People of the V.I.*, 62 V.I. 271, 297–98 (V.I. Super. Ct. 2015). The Court has not found precedent where a potential award was a constitutionally protected "private interest" and declines to hold otherwise. *See Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 88 n.32 (1978); *Lucas v. United States*, 807 F.2d 414, 421–22 (5th Cir. 1986) ("[A] person has no property, no vested interest, in any rule of the common law. . . . Indeed, statutes limiting liability are relatively commonplace and have consistently been enforced by the courts."). The United States Supreme Court has clarified that a constitutionally protected property interest is more than an "abstract need or desire" for a benefit, instead one must have a "legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

¶ 47.    Gumbs' alleged property interest in the $2 million falls far short of the traditional property interests protected by procedural due process. Even if Gumbs could demonstrate a property interest, she is currently being afforded the normal protections associated with procedural due process. *Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971) (holding that procedural due process requires a person to be given notice and an opportunity to be heard). Gumbs was on notice that her recovery would be limited by section 166b, which was enacted forty-five years ago. Gumbs' argument that the cap "deprives [her] of access to the court," obviously fails because she is currently before the Court having her grievances heard by a neutral decisionmaker. There is no identifiable property interest in a potential damages award, so the $250,000 medical malpractice damages cap does not infringe on Gumbs' procedural due process rights guaranteed by the ROA.

¶ 48.    Second, Gumbs' argument that the damages cap violates her substantive due process rights falls short for the same reasons as her equal protection claim. The *Balboni* court found that it has the power to interpret the ROA's due process provision like a state court of last resort interprets

28

its state's constitutional provisions. *Balboni*, 70 V.I. at 1089–90. But the Court never reached

Balboni's due process argument, and thus never ruled on what standard would apply. *See id.*

However, as described earlier in this opinion, this Court believes heightened rational basis review

is the appropriate standard for evaluating a substantive due process claim that does not involve

fundamental rights.

¶ 49.    Gumbs' argues that the cap deprives her of access to the court and a full and fair jury trial.

Again, Gumbs has been afforded all the rights and remedies available to any party, including

requesting a jury trial. Ultimately, because section 166b does not implicate any identifiable life,

liberty, or property interest, nor is there an abrogation of unenumerated fundamental rights, her

claim is subject to the same heightened scrutiny analysis conducted above. Having already

concluded section 166b survives heightened rational basis review, the Court holds that the

$250,000 medical malpractice damages cap does not violate the due process provision of the

Virgin Islands Bill of Rights.

### C.  Gumbs' Trial by Jury Claim Fails.

¶ 50.    Gumbs also argues that the damages cap unconstitutionally impedes on her right to a trial

by jury. The Seventh Amendment applies to the Virgin Islands through § 3 of the ROA and states:

> In Suits at common law, where the value in controversy shall exceed twenty dollars,
> the right of trial by jury shall be preserved, and no fact tried by a jury, shall be
> otherwise reexamined in any Court of the United States, than according to the rules
> of the common law.

U.S. Const. amend. VII; *see also Kennon v. Gilmer*, 131 U.S. 22, 28 (1889) (holding that the

Seventh Amendment is "in full force" in all territories of the United States). In *Murrell v. People*,

54 V.I. 338 (V.I. 2010), the Virgin Islands Supreme Court held that the right to a jury trial is

fundamental in criminal trials but did not extend the right to civil trials. *See Balboni*, 70 V.I. at

1129 (Cabret, J., dissenting) ("[T]his court has recognized that the right to a jury trial is a fundamental right in a criminal trial, we have never found the civil right to jury trial to be fundamental."). The United States Supreme Court has never incorporated the right to trial by jury in civil cases against the states and it routinely upholds federal limitations on the right. *Minneapolis & S. L. R. Co. v. Bombolis*, 241 U.S. 211, 217–220 (1916); *see, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) ("The Seventh Amendment has never been interpreted in the rigid manner advocated . . . . On the contrary, many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to be inconsistent with the Seventh Amendment."); *Colgrove v. Battin*, 413 U.S. 149, 157 (1973) ("[N]ew devices may be used to adapt the [common law right to trial by jury] to present needs and to make of it an efficient instrument in the administration of justice . . . .") (quoting *Ex parte Peterson*, 253 U.S. 300, 309–10 (1920)).

¶ 51.    Gumbs believes that section 166b "unconstitutionally impedes a jury's fact-finding ability by limiting economic damages to $250,000." Pl.'s Mot. 17–18. She also alleges that the cap works as a statutory remittitur and is therefore barred by *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400 (V.I. 2016), which rejected the common law doctrine of remittitur. On the other hand, Defendants argue that the cap does not interfere with the jury's fact-finding role, emphasizing that the judge is merely enforcing a "consequence of those factual determinations." Defs.' Opp'n. 17. Thus, the damages cap does not infringe on Gumbs' right to a jury trial because it merely limits the legal consequences of a jury's findings, a very much permissible scope of action for the Legislature. Again, on this point, the Court agrees with Defendants.

¶ 52.    The Court is persuaded by the Third Circuit's reasoning in *Davis v. Omitowoju*, 883 F.2d 1155 (3d Cir. 1989). Echoing *Boyd v. Bulala*, 877 F.2d 1191 (4th Cir. 1989), the Third Circuit held

that "even though it is the jury's role to determine the facts, it is not the role of the jury to determine the legal consequences of its factual findings . . . that is a matter for the legislature." *Davis*, 883 F.2d at 1161. Once the jury has made its findings of fact, "it has fulfilled its constitutional function, but it cannot mandate compensation as a matter of law." *Id.; see also Phillips*, 684 N.W.2d at 181– 82 (explaining that the jury may only determine what happened, how, and when, but may not resolve the law itself). In this way the civil system parallels the criminal system where the jury determines the facts and the court determines the outcome of those facts using the "guidance and requirements set forth by the Legislature." *Phillips*, 684 N.W.2d at 183. The Third Circuit further reasoned that "if the legislature could abolish a cause of action entirely without violating the Seventh Amendment, then it could properly limit the damages that could be recovered." *Davis*, 883 F.2d at 1161; *see also Arbino v. Johnson & Johnson*, 880 N.E.2d 420, 431 (Ohio 2007) ("So long as [the jury's] fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body's findings, awards may be altered *as a matter of law*. There is no dispute that the right to trial by jury does not extend to the determination of questions of law.") (emphasis in original). By enforcing the $250,000 damages cap, a judge is merely applying the law to the facts already determined by the jury in accordance with statutory limitations prescribed by the Virgin Islands Legislature.

¶ 53.    Under the United States Supreme Court's approach to analyzing Seventh Amendment claims, this Court must ask whether the damages cap preserves "the substance of the common law right" by looking for historical analogies. *Markman*, 517 U.S. at 376. The United States Supreme Court has routinely upheld alterations to traditional common law jury practices so long as the jury's "fundamental" function is preserved. *See Tull v. United States*, 481 U.S. 412, 426 (1987) (holding that the Seventh Amendment only preserves incidents of trial deemed fundamental to the

right); *Galloway v. United States*, 319 U.S. 372, 392 (1943) (same); *Dimeck v. Schiedt*, 293 U.S. 474, 486 (1935) (finding that the judicial practice of remittitur would not violate the Seventh Amendment); *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 498 (1931) (stating that the Seventh Amendment is "concerned, not with [the] form, but with [the] substance" of the right to trial by jury). Moreover, in analyzing an application of the Seventh Amendment to New Mexico prior to statehood, the United States Supreme Court held that an act of the territorial legislature that restructured how questions were submitted to a jury and verdicts were rendered did not violate the right to trial by jury. *Walker v. N.M. & S. P. R. Co.*, 165 U.S. 593, 596 (1897) ("So long as this substance of right is preserved the procedure by which this result shall be reached is wholly within the discretion of the legislature, and the courts may not set aside any legislative provision in this respect because the form . . . is different from that which obtained at the common law."). The historical practice of remittitur is most analogous to a statutory damages cap, though there are significant differences that are explained below. The United States Supreme Court has found, albeit indirectly, that remittitur does not violate the Seventh Amendment because it leaves the fundamental jury function and findings intact. *Dimeck*, 293 U.S. at 486 ("[R]emittitur has the effect of merely lopping off an excrescence."). As section 166b does not remove the traditional factfinding function of the jury, nor place it in the hands of the judge, this Court believes section 166b leaves the substance of the right intact and therefore does not violate the Seventh Amendment.

¶ 54.    Gumbs argues that the damages cap acts as a remittitur because it "ultimately vests [the power of a jury] with a judge who is statutorily required to reduce a jury verdict higher than $250,000." Pl.'s Mot. 18. Meanwhile Defendants contend that the damages cap is not like a remittitur because courts in this jurisdiction have previously held that the Seventh Amendment

does not "prevent the Legislature from passing a statute that involves a predetermined limitation based on what it believes to be sound policy for the Virgin Islands." Defs.' Opp'n. 18 (citing *Balboni*, 2018 V.I. LEXIS 4, at \*12).

¶ 55.    Gumbs relies on *Antilles School*, where the Virgin Islands Supreme Court declined to recognize the common law doctrine of remittitur in this jurisdiction. 64 V.I. at 437. That case held that Virgin Islands courts do not have the judicial power of remittitur, but can alter a jury's verdict only if it is supported by sufficient evidence in the record, or if a reduction is compelled under the United States Constitution. *Id.* at 437–39. Remittitur is a discretionary power of the trial judge, distinct from a damages cap, which represents a legislative judgment that removes power from the trial judge. *Id.* at 430; *Davis*, 883 F.2d at 1162. The second clause of the Seventh Amendment speaks to the role of the court and "proscribes reexamination of any fact tried by a jury," it does not limit the power of the Legislature. *Balboni*, 70 V.I. at 1128 (citing *Davis*, 883 F.2d at 1162 ("[I]t is significant to us that unlike the first clause of the Seventh Amendment which in broad terms preserves the right to a trial by jury, the second clause speaks exclusively of the role of the court. The second clause makes no mention of the other branches of government.")). Nothing in the language of the Seventh Amendment restricts the Legislature from enacting recovery caps like the one in section 166b; instead, it precludes a court from independently interfering with a jury's verdict. *Davis*, 883 F.2d at 1165 ("Where it is the legislature which has made a rational policy decision in the public interest, as contrasted with a judicial decision which affects only the parties before it, it cannot be said that such a legislative enactment offends either the terms, the policy or the purpose of the Seventh Amendment."). Therefore, the issue becomes whether the Legislature can limit the jury's remedial authority, and the Court believes it can. *Id.* at 1160.

¶ 56. Complying with section 166b in no way requires the Court to violate the Seventh Amendment. This Court has preserved the right to a jury trial for fact-finding purposes regarding total damages and the $250,000 damages cap does not require the Court to re-examine the jury's factual determinations. Rather, by imposing the cap, a court is "implementing a policy decision of the legislature." *Id.* at 1162. The Court must give substantial deference to the Virgin Islands Legislature and apply the predetermined extent and amount of damages allowable in a malpractice action. The Seventh Amendment does not apply to the power of the legislature, it only precludes a judicial redetermination of facts. U.S. Const. amend. VII ("and no fact tried by a jury, shall be otherwise reexamined in any Court"). It is firmly within the authority of the Legislature to modify the nature and extent of common law causes of action. Therefore, the Court finds that section 166b does not violate the Seventh Amendment.

### D. Analogous State and Territorial Court Rulings

¶ 57. In support of this ruling, the Court also undertakes a comparative analysis of what state and territorial courts have done when faced with similar challenges to medical malpractice damages caps. A review of cases yields varying results, which can be attributed to both the variation in legislation and in the constitutional standards applied. In terms of statutory damages caps, seventeen of the fifty states have no cap on economic or non-economic damages in the medical malpractice context. The remaining thirty-three states all cap non-economic damages, and five within the thirty-three cap economic damages as well.[10] The caps on non-economic damages range from $250,000 to $815,000 and sometimes increase periodically to account for inflation.

---

[10] Center for Justice and Democracy, *Caps on Compensatory Damages: State Law Summary*, NEW YORK LAW SCHOOL (Aug. 2020), https://centerjd.org/content/fact-sheet-caps-compensatory-damages-state-law-summary; *accord* Dani Alexis Ryskamp, *Medical Malpractice Damages Caps: A State By State Comparison*, EXPERT INSTITUTE (June 2020),
https://www.expertinstitute.com/resources/insights/medical-malpractice-damages-caps-a-state-by-state-comparison/.

The five states that limit both economic and non-economic damages have caps ranging from $500,000 to $2.25 million, again many increasing by year with inflation. These five states with "umbrella caps"—Colorado, Indiana, Louisiana, Nebraska, and Virginia—are the most relevant, because section 166b similarly caps total damages, albeit at a lesser amount. The Court also examines cases where state courts addressed constitutional challenges to non-economic damages caps because much of the same reasoning holds true.

¶ 58.    Approaches taken by other United States Territories are instructive and help explain the rationale behind the MMA. Many territories face similar challenges in recruiting quality medical professionals and those legislatures have intervened to ensure services are available to residents. For example, Guam requires arbitration for all medical malpractice claims and limits damages in claims against government employed healthcare providers to $300,000. 10 Guam Code Ann. § 10102 (2020); 5 Guam Code Ann. § 6301 (2020). The rationale for the Guam limitation is that "unlike private parties, the government has a continuing responsibility for the whole people of Guam. One or two suits cannot defeat the rationale for the government's existence by so depleting the treasury that the government cannot function." 5 Guam Code Ann. § 6301 cmt. In a wrongful death action against the Guam Memorial Hospital Authority, the Guam Supreme Court upheld the damages cap over equal protection, due process, and right to trial by jury challenges after finding many state courts had rejected similar challenges. *Newby v. Government*, 2010 Guam 4, ¶¶ 39–47.

¶ 59.    Puerto Rico caps damages at $150,000 in medical malpractice actions against the government or any healthcare provider working at a government facility. P.R. Laws Ann. tit. 32, § 3077 (2020) (limiting damages in actions against "healthcare professionals working . . . exclusively at public health institutions of the Commonwealth of Puerto Rico . . . regardless of whether said institutions are being administered or operated by a private entity"); *see also* P.R.

Laws Ann. tit. 26, § 4105 (2011) (broadly defining the healthcare professionals shielded from liability). The Puerto Rico Supreme Court upheld the damages limitations over an equal protection and fundamental rights challenges using rational basis review. *Egmidio Defendini Collazo v. Puerto Rico. M.F.R. v. Victor M. Alamo Garcia*, 134 D.P.R. 28, 134 PR Sup. LEXIS 28 (P.R. 1993). Likewise, the Northern Mariana Islands and American Samoa have faced issues with malpractice claims against government healthcare providers and constrained funding to pay awards.[11] In fact, American Samoa does not permit lawsuits against individual healthcare providers, only the government can be sued for malpractice claims and damages are limited to $500,000. *See Aga v. American Samoa Government*, 3 Am. Samoa 2d 130 (1986). The Commonwealth of the Northern Mariana Islands, another territory with limited providers, enacted legislation to shield healthcare providers from liability. *See* 2006 N. Mar. I. Pub. Law 15-22. "With such a small risk pool, no reputable U.S. insurance carrier will sell medical malpractice coverage [to the Northern Mariana Islands]. So, the private practitioners simply do without, and the government providers are immune from suit by statute."[12] The Court finds these observations helpful to contextualize the healthcare and medical malpractice insurance landscapes in United States Territories, where the government is heavily involved, in comparison to the mainland, where private insurance plays a much larger role.

¶ 60.    Turning back to the states, at least six state supreme courts have struck down medical

---

[11] Fili Sagapolutele, *American Samoa Gov't Drafting Malpractice Legislation*, CUNNINGHAM GROUP (Jan. 3, 2008), https://www.cunninghamgroupins.com/american-samoa-govt-drafting-malpractice-legislation. The Northern Mariana Islands, Guam, and American Samoa have population sizes most comparable to the Virgin Islands and all less than 200,000. *The U.S. Census Bureau Begins to Count U.S. Island Areas Populations*, UNITED STATES CENSUS BUREAU (Mar. 2, 2020). https://www.census.gov/newsroom/press-releases/2020/2020-island-areas-populations.html

[12] *Medical Malpractice*, PACIFIC BASIN TELEHEALTH RESOURCE CENTER, http://www.pbtrc.org/policy-regulations/malpractice/.

malpractice damages caps on constitutional grounds, including Alabama,[13] Florida,[14] Georgia,[15] Illinois,[16] New Hampshire,[17] and Washington.[18] Numerous state courts have upheld damages caps against constitutional challenges as well. *See, e.g., Evans v. State*, 56 P.3d 1046, 1051 (Alaska 2002) (finding $400,000 non-economic damages cap did not violate right to trial by jury); *Mayo*, 914 N.W.2d at 697 (upholding $750,000 non-economic damages cap on heightened rational basis review). Notably, courts in all five states with combined economic and noneconomic damages caps have upheld those caps over constitutional objections. *See Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901, 907 (Colo. 1993); *Johnson*, 404 N.E.2d at 601; *Oliver v. Magnolia Clinic*, 85 So. 3d 39, 44 (La. 2012) (reaffirming constitutionality); *Gourley v. Nebraska Methodist Health Sys.*, 663 N.W.2d 43, 65 (Neb. 2003); *Pulliam*, 509 S.E.2d 307, 310 (Va. 1999) (reaffirming constitutionality).

¶ 61.    Courts have been especially willing to uphold combined caps where the government plays a role in backing the insurance scheme or paying the awards. *See, e.g., Packard v. Joint Sch. Dist.*, 661 P.2d 770, 775 (Idaho Ct. App. 1983) (upholding $100,000 cap in actions against government on heightened rational basis review); *Johnson*, 404 N.E.2d at 601 (upholding $500,000 combined cap over multiple constitutional objections); *Estate of Cargill v. Rochester*, 406 A.2d 704, 708 (N.H. 1979) (upholding $50,000 cap because it was reasonable that "the legislature limited the

---

[13] *Moore*, 592 So. 2d at 171 (striking $400,000 non-economic damages cap on state equal protection grounds using heightened scrutiny).

[14] *N. Broward Hosp. Dist.*, 219 So. 3d at 50 (striking $500,000 non-economic damages cap on state equal protection grounds using rational basis review).

[15] *Atlanta Oculoplastic Surgery*, 691 S.E.2d at 221 (striking $350,000 non-economic damages cap for violating state constitution's right to trial by jury).

[16] *Lebron*, 930 N.E.2d at 908 (striking $500,000 non-economic damages cap for violating state constitution's separation of powers provision).

[17] *Brannigan v. Usitalo*, 587 A.2d 1232, 1235 (N.H. 1991) (striking $875,000 non-economic damages cap on state equal protection grounds using heightened scrutiny).

[18] *Sofie v. Fibreboard Corp.*, 771 P.2d 711, 728 (Wash. 1989) (striking formulaic non-economic damages cap for violating state constitution's right to trial by jury).

financial strain to be imposed on certain governmental units by large judgments or high insurance premiums"). In upholding Indiana's combined cap, the state's highest court was persuaded the cap served an integral purpose in the government-backed malpractice insurance scheme. *Johnson*, 404 N.E.2d at 601. It reasoned that:

> The Legislature responded [to a healthcare crisis] by creating the patient compensation fund and the residual malpractice insurance authority, thereby providing a government sponsored risk spreading mechanism as an alternative to insurance strictly from private sources. In so doing it set the limitations upon recovery. The mechanism cannot operate without the voluntary participation of health care providers. The limitation may well provide health care providers with the incentive to participate.

*Id.* Similarly, in *Butler v. Flint Goodrich Hosp. of Dillard Univ.*, 607 So. 2d 517, 521 (La. 1992), the Louisiana Supreme Court upheld a $500,000 combined cap over an equal protection challenge largely because it found the legislature had made a reasoned judgment that the cap and state-backed insurance scheme would draw more healthcare professionals to the state. *Accord Oliver*, 85 So. 3d at 44 (reaffirming *Butler*). It found that the cap was a reasonable means of ensuring more professionals had malpractice insurance and guaranteed a solvent fund to pay judgments. *Butler*, 607 So. 2d at 522. Balanced against the competing concern—that the worst injured victims would not receive full compensation—the court could not say that the legislature had made an unreasonable or arbitrary judgment. *Id.*

¶ 62. This Court is persuaded by the reasoning of the Indiana and Louisiana Supreme Courts, which addressed situations most closely resembling that of the Virgin Islands. *See Brady*, 55 V.I. at 815 (noting that the MMA uses language almost identical to the Indiana Medical Malpractice Act). Like both Indiana and Louisiana, the Virgin Islands has a relatively low combined economic and non-economic damages cap. While this type of cap appears most vulnerable to a constitutional challenge because it leaves certain victims seriously undercompensated, legislatures enacting these

caps have had good reason. These state governments have taken over the malpractice insurance systems in an effort to reduce premiums and ensure the availability of healthcare to the general public. This has required legislatures to make the difficult decision to leave some victims undercompensated to protect the malpractice payment funds from depletion. Striking a balance that compensates the greatest number of victims through a solvent fund, while ensuring the availability of healthcare is exactly the type of decision entrusted to the representative branch of government and this Court will not second-guess the Legislature's judgment of where the public interest lies. *Dennis v. United States*, 341 U.S. 494, 539–40 (1951) ("How best to reconcile competing interests is the business of legislatures, and the balance they strike is a judgment not to be displaced by ours, but to be respected unless outside the pale of fair judgment."); *In re Grand Jury Proceedings*, 103 F.3d 1140, 1154 (3d Cir. 1997) ("The legislature, not the judiciary, is institutionally better equipped to perform the balancing of the competing policy issues . . . ."); *In re Estate of George*, 59 V.I. 913, 924 (V.I. 2013) ("[I]t is not the function of this Court to substitute its judgment for that of the Legislature.") (quoting *Brady v. Gov't of the V.I.*, 57 V.I. 433, 443 (V.I. 2012)). Like courts in Colorado, Indiana, Louisiana, Nebraska, Virginia, Guam, and Puerto Rico, this Court upholds the Legislature's judgment that a damages cap is a necessary component of the Virgin Islands healthcare landscape.

## IV.     CONCLUSION

¶ 63.     The MMA's $250,000 cap on total damages represents a legislative decision to limit awards in order to lower the government-paid malpractice insurance premiums and judgments. From the record, it appears the Legislature acted with proper motives and the best interest of Virgin Islands citizens in mind. The limitation on damages is a rational means of minimizing government costs and ensuring the availability of healthcare, supported by evidence that it is working. On these

grounds, the Court finds that section 166b does not infringe on Gumbs' equal protection, due

process, or trial by jury rights guaranteed by the ROA and the United States Constitution, therefore

the motion will be denied. An order of even date follows.

Dated: October 19, 2020

**Renée Gumbs Carty**
Judge of the Superior Court
of the Virgin Islands

ATTEST:
Tamara Charles
Clerk of the Court

By:
Lori Boynes-Tyson
Chief Deputy Clerk

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| JAH-I-DAH GUMBS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SCHNEIDER REGIONAL MEDICAL )<br>CENTER, MARIA C. JUELLE, P.A., JAMES W. )<br>FREEMAN, M.D., JOHN DOE AND JANE DOE, )<br>)<br>Defendants. )<br>_____ ) | CASE NO. ST-17-CV-272<br><br>ACTION FOR DAMAGES<br><br>JURY TRIAL DEMANDED<br><br>Cite as 2020 VI Super 87 |

## ORDER

**AND NOW**, for the reasons stated in the accompanying Memorandum Opinion, it

is hereby

**ORDERED** that Plaintiff's motion is **DENIED**; and it is further

**ORDERED** that copies of this Order shall be distributed to Julie German Evert,

Esquire, Lee J. Rohn, Esquire, E. Michael Brezina, III, Esquire, and Royette Russell,

Esquire.

Dated: October 19, 2020

ATTEST:
Tamara Charles
Clerk of the Court

By: _____
Lori Boynes-Tyson
Chief Deputy Clerk 10 / 19 / 2020

_____
**Renée Gumbs Carty**
Judge of the Superior Court
of the Virgin Islands